15 F.3d 1093
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jerry Wayne MONTGOMERY, Defendant-Appellant.
 No. 93-30046.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 15, 1993.
Decided Dec. 22, 1993.
 
 Before: GOODWIN, CANBY and KOZINSKI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Jerry Wayne Montgomery appeals his guilty plea conviction of various marijuana trafficking offenses, arguing that the district court erred in denying his motions to suppress. He contends that the evidence discovered during three searches should have been excluded because the warrants authorizing them were not supported by probable cause. We AFFIRM.
 
 I.
 
 3
 A. The Warrant to Search Montgomery's Residence
 
 
 4
 Sometime in May 1992, a United States Border Patrol agent, Fred Bauman, informed the Okanogan County Sheriff's Department that a Canadian national named Victor Fodor was transporting truckloads of marijuana from Tonasket, Washington, to Canada. Bauman reported that the Tonasket Police Department "had received information" that on a previous trip, Fodor had parked his truck with the canopy attached at a certain restaurant. Another unidentified individual drove the truck away and returned it a short time later without the canopy. The following day, Fodor "would be seen" driving towards the Canadian border with the canopy re-attached.
 
 
 5
 At 9 PM on May 14, 1992, Bauman learned that Fodor was staying at a certain Tonasket motel and set up surveillance. Police observed Fodor's activities continuously from 10 PM until 2 AM, an hour after Fodor came out of his room partially dressed, checked that his pickup truck was locked, returned to his room and turned off the lights. Surveillance resumed at 6 AM the following morning. At 9 AM, Fodor placed two suitcases in the back of his pickup truck and left the motel. Officers followed him, keeping his truck in sight at all times. Although Fodor made several brief stops, he did not remove the suitcases. At about 9:30 AM, he turned into a private driveway and disappeared. One of the officers knew that the driveway led to a single residence and that the property had only one exit. They therefore waited for Fodor at the driveway entrance. The residence ultimately turned out to be occupied by Montgomery and Susan Piccardo.
 
 
 6
 Three hours later, Fodor reappeared and began driving toward the Canadian border. Police followed him, again keeping the truck in sight. Fodor stopped twice at restaurants, but did not remove the suitcases. Shortly before he reached Canada, border patrol agents arrested him for immigration violations. Fodor had approximately 100 pounds of marijuana hidden in the canopy of his truck and $3,000 on his person. The suitcases were gone.
 
 
 7
 In a police interview, Fodor admitted that he had made two previous trips from the United States to Canada for people who were paying him $3,000 to transport marijuana. He stated that he obtained the marijuana in the United States and planned to deliver it to his employers in Canada that day. He also indicated he planned to return to the United States the following day in another pickup to collect the rest of the load.
 
 
 8
 Based on these events, police requested a warrant to search Montgomery's house. Their affidavit described the above events and stated that police suspected that Fodor had loaded the marijuana into his truck while it was hidden from view at the Montgomery residence and paid with cash contained in the missing suitcases. In support of this belief, the affidavit noted that (1) Fodor stated that he picked up the marijuana in the United States; (2) loading the marijuana into the roof must have taken 2-3 hours;[1] (3) the only time Fodor's pickup was out of view that day was while it was at the Montgomery residence and, in the officers' experience, a smuggler would not leave such a valuable and pungent[2] shipment unguarded in a motel parking lot all night; (4) the suitcases were in the truck before Fodor went to Montgomery's house and were missing afterwards; and (5) the marijuana was worth approximately $1,000 per pound (a total of $1,000,000) and, in the officers' experience, a smuggler would require payment on delivery for such a large shipment.
 
 
 9
 The magistrate judge concluded that this information established probable cause and issued a warrant to search Montgomery's residence. Police executed this warrant shortly after midnight on May 15 and found forty-three one pound plastic baggies of marijuana, empty plastic baggies, large hefty plastic bags, and fabric freshener sheets, all of which resembled items found in Fodor's truck. In addition, they found a lease indicating that Montgomery was renting a certain shop.
 
 
 10
 B. The Warrant to Search Montgomery's Rented Shop
 
 
 11
 Because the officers were unable to find growing equipment or scales at Montgomery's house and because both Montgomery and Piccardo stated that Piccardo was not involved in the marijuana operation, they believed that the marijuana found in Fodor's truck was grown and packaged at this rented shop.
 
 
 12
 Based on this information, police obtained a warrant to search Montgomery's rented shop.
 
 
 13
 C. The Warrant to Search the Residence Attached to the Shop
 
 
 14
 At Montgomery's shop, police found approximately five-hundred growing marijuana plants and evidence of a recent harvest. In addition, they noticed a one-story residence located on the same property. A hose connected this residence to the shed containing the growing marijuana plants; its windows were covered with black plastic inside and clear plastic outside; and the power meter was running faster than normal although no one was inside. One of Montgomery's keys fit the padlock on the door.
 
 
 15
 Based on these facts, police obtained a warrant to search the residence. The residence contained additional marijuana plants and grow equipment.
 
 
 16
 Thereafter, a grand jury indicted Montgomery on four counts of drug trafficking in violation of 21 U.S.C. Secs.Sec. 846, 841(a)(1) & 841. Montgomery timely moved to suppress the evidence found at his residence and shop, arguing that the warrants were not supported by probable cause. The district court denied this motion and a motion for reconsideration. Montgomery then pled guilty pursuant to Fed.R.Crim.Proc. 11(e), reserving his right to appeal the suppression motions. This appeal followed.
 
 II.
 
 17
 We review the issuance of a search warrant for clear error, and will uphold it so long as the court had a "substantial basis" for concluding that the police affidavit established probable cause. United States v. Bertrand, 926 F.2d 838, 841 (9th Cir.1991). In so doing, we apply the "totality of the circumstances" test articulated in Illinois v. Gates, 462 U.S. 213, 238 (1983). Applying this differential standard; we find that the magistrate did not err in issuing any of the warrants.
 
 
 18
 A. The Warrant to Search Montgomery's Residence
 
 
 19
 Montgomery emphasizes that the affidavit filed in support of the first warrant contained "unsubstantiated hearsay" information about Fodor's criminal activity and modus operandi. The affidavit states that officers "received information" and does not specify the source of this information. Moreover, Montgomery notes, the hearsay indicated that another person loaded marijuana into Fodor's truck while Fodor waited at a restaurant, which is inconsistent with the actual events and suggests that Fodor might have loaded the truck either before the police began their surveillance or when the surveillance was discontinued from 2 AM to 6 AM. Finally, Montgomery argues, the affidavit does not contain any information directly linking Montgomery with marijuana trafficking; the mere fact that a drug dealer visited a certain house does not establish probable cause to search that house.
 
 
 20
 These arguments examine the affidavit's various elements in isolation. However, we must examine the affidavit as a whole and determine whether the totality of the circumstances provided the magistrate with a substantial basis for finding probable cause. Applying this standard, we cannot find that the magistrate erred.
 
 
 21
 The "unsubstantiated hearsay" regarding Fodor's supposed routine was corroborated by Fodor's own statements as well as the police officers' direct observations. Fodor's statements bear indicia of reliability, as they are statements against penal interest. United States v. Angulo-Lopez, 791 F.2d 1394, 1397 (9th Cir.1986) (citations omitted). Even an anonymous informant may be considered reliable if his information is corroborated by police officers' direct observations. Gates, 462 U.S. at 238; United States v. Alvarez, 899 F.2d 833 (9th Cir.1990), cert. denied, 111 S.Ct. 671 (1991).
 
 
 22
 Moreover, police did not simply establish that a drug dealer visited Montgomery's house; circumstantial evidence supports their conclusion that Fodor's visit was related to his criminal activity. Fodor stated that he got the drugs in the United States. The police established that he left the suitcases at Montgomery's house, as he did not remove them before or after he left the house. He stayed at Montgomery's house long enough to have loaded the marijuana, and began driving towards the Canadian border as soon as he left. "[I]n weighing the evidence supporting a request for a search warrant, a magistrate may rely on the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found." United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir.1987) (citations omitted). The magistrate judge did not err in relying on the experienced officers' conclusions that the marijuana would be paid for in cash, and that Fodor would not leave the marijuana unguarded in his truck all night, where its odor could be detected by a passerby. Fodor did not have any other opportunity to load the marijuana into the truck that day.
 
 
 23
 Although Fodor could have loaded the marijuana during the night or before police began watching him, a magistrate "need not determine that the evidence sought is in fact on the premises to be searched ... or that the evidence is more likely than not to be found where the search takes place ... [but only that] it would be reasonable to seek the evidence in the place indicated in the affidavit." United States v. Terry, 911 F.2d 272, 275 (9th Cir.1990) (quoting United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir.), cert. denied, 106 S.Ct. 139 (1985) (citations omitted) (emphasis in the original)).
 
 
 24
 Based on the sequence of events, the magistrate reasonably concluded that evidence related to Fodor's drug trafficking operation might be at Montgomery's residence.[3]
 
 
 25
 B. The Warrant to Search Montgomery's Rented Shop
 
 
 26
 The magistrate also did not err in issuing the warrant to search Montgomery's shop. The search of Montgomery's house uncovered items (bags of marijuana and fabric freshener) similar to those found in Fodor's truck. This evidence, plus the circumstantial evidence of Fodor's three hour visit, suggests that Fodor may have loaded the marijuana into his truck when he stopped at Montgomery's house. Since police found no grow equipment or scales at Montgomery's house, they were not unreasonable in presuming that the marijuana was grown and packaged somewhere else nearby. Although the marijuana could have been grown and packaged on property not owned or controlled by Montgomery, "in the case of drug dealers evidence is likely to be found where dealers live" or on property which they control. Angulo-Lopez, 791 F.2d at 1399. Since the police had substantial evidence supporting their theory that Montgomery was a drug dealer, the magistrate did not err in concluding that evidence relating to this activity might reasonably be at his rented shop.
 
 
 27
 C. The Warrant to Search the Residence Adjoining the Shop
 
 
 28
 Assuming the other warrants are valid, the warrant to search the residence adjoining the rented shop is obviously valid.
 
 
 29
 Montgomery's conviction is hereby AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The canopy had 100-150 screws and it took three policemen 1 1/2 hours to disassemble it
 
 
 [2]
 The marijuana's odor could be detected from outside the truck
 
 
 [3]
 None of the cases Montgomery cites compel a contrary result. In United States v. Hove, 848 F.2d 137 (9th Cir.1988), police requested a warrant to search a certain house, but the affidavit in support of their request completely failed to provide any information linking the suspect with the house in question. The present case does not involve this problem. The affidavit indicates that Fodor stopped at the Montgomery residence long enough to load the marijuana, right before he began driving to the Canada border, and that he left suitcases at the house
 United States v. Weber, 923 F.2d 1338 (9th Cir.1990), on which Montgomery heavily relies, is also distinguishable. In that case, police obtained a warrant to search a house for child pornography based on an affidavit stating (1) that pornographic materials had been sent to the house two years previously ; (2) that the resident had ordered materials from a catalog sent by the police and (3) that pedophiles and collectors of child pornography "typically" keep certain materials at their home. The affidavit contained no other evidence supporting their conclusion that the defendant was in fact a pedophile or a collector of child pornography. In the present case, the officers' conclusions about Fodor's drug smuggling were supported by irrefutable, recent evidence, including the drugs and Fodor's own admissions. Their assertions about the types of risks drug smugglers typically take in storing large amounts of marijuana are not merely conclusory allegations, but plausible assertions based on specific facts. Finally, their conclusion that Montgomery's home may contain evidence is based not on an unsupported theory about what people like Montgomery typically do, but on a plausible interpretation of events which they directly observed.